IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WARREN O'CONNELL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06 - 238E |
| | ) | |
| v. | ) | Judge David S. Cercone / |
| | ) | Magistrate Judge Lisa Pupo |
| Superintendent RAYMOND J. SOBINA; DSFM | ) | Lenihan |
| MICHAEL C. BARONE; MAJOR RICHARD M. HALL; | ) | |
| MAJOR EDWARD WOJCIK; MS. D. PENICH; UNIT | ) | |
| MANAGER PAUL A. ENNIS; UNIT MANAGER BILL | ) | |
| C. DOMBROWSKI; SUPT. ASSIST. CHRISTINA | ) | |
| KENNEDY; CHIEF GRIEVANCE OFFICER SHARON | ) | |
| BURKS; SEC. OF CORR. JEFFERY A. BEARD; | ) | |
| TRANSFER TECH. DONALD WILLIAMSON; P.B.P.P. | ) | |
| SECRETARY & ACTING SECRETARY SUPT. OF | ) | |
| SCI FAYETTE HARRY E. WILSON; SUPT. ASSIST. | ) | |
| MARY ANN KUSHNER; DEPUTY BURNS, *DSFM;* | ) | |
| LIBRARIAN *(JANE OR JOHN DOE);* INMATE | ) | |
| ACCOUNTS *(JANE OR JOHN DOE);* UNIT | ) | |
| MANAGER JOSEPH F. TREMPUS; UNIT MANAGER | ) | |
| MICHAEL ZAKEN; CAPT. NICKELSON; LT. | ) | |
| KREMPOSKY; LT. CRUMB; OFFICE OF THE | ) | |
| ATTORNEY GENERAL, PA | ) | |
| | ) | |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

I.        RECOMMENDATION

        For the reasons that follow, it is respectfully recommended that the Motion to

Dismiss (doc. no. 17) be granted as to Defendants Beard, the Pennsylvania Board of Probation and

Parole Secretary and Acting Secretary, Wilson, the Attorney General of the Commonwealth of

Pennsylvania and denied as to Defendant Sobina as to Plaintiff's retaliation claims regarding abusive

cell searches and his transfer from SCI-Forest to SCI-Cresson in May of 2006. In addition, it is

respectfully recommended that, in accordance with the PLRA, Plaintiff's claims be dismissed

against all of the remaining Defendants except Defendants Barone, Hall and Wojcik as to the single claim that these Defendants either ordered or participated in abusive cell searches during January through April of 2006.

II.        REPORT

Plaintiff, Warren O'Connell, a state prisoner previously confined at the State Correctional Institution at Forest located in Marienville, Pennsylvania, commenced this action pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983 against twenty-three Defendants alleging various violations of his Constitutional rights. His claims are discussed below.

### A. Standards of Review

1.        Motion to Dismiss

Defendants Sobina, Beard, Secretary and Acting Secretary of the Pennsylvania Board of Probation and Parole, Wilson and the Attorney General of the Commonwealth of Pennsylvania have filed a Motion to Dismiss under Fed. R. Civ. P. 12(6)(6) (doc. no. 17). As the United States Supreme Court recently held in Bell Atlantic Corp. v.Twombly, 127 S. Ct. 1955 (May 21, 2007), a complaint must be dismissed pursuant to Fed. R. Civ. P. 12 (b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." Id. at 1974 (rejecting the traditional 12 (b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The court must accept as true all allegations of the Complaint and all reasonable factual inferences must be viewed in the light most favorable to plaintiff. Angelastro v. Prudential-Bache Securities, Inc., 764 F.2d 939, 944 (3d Cir. 1985). The Court, however, need not accept inferences drawn by plaintiff if they are unsupported by the facts as set forth in the complaint. See California Pub. Employee Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) (citing Morse v. Lower Merion School Dist.,

132 F.3d 902, 906 (3d Cir. 1997)).  Nor must the court accept legal conclusions set forth as factual allegations.  Bell Atlantic Corp., 127 S. Ct. at 1965 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).  "Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp., 127 S.Ct. at 1965.  Although the United States Supreme Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face."  Id. at 1974.

Courts consider the allegations of the complaint, attached exhibits, and matters of public record in deciding motions to dismiss.  Pension Benefit Guar. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  In addition, factual allegations within documents described or identified in the complaint may be considered if the plaintiff's claims are based upon those documents.  Id. (citations omitted).  A district court may consider these documents, as well as indisputably authentic documents, without converting a motion to dismiss into a motion for summary judgment.  Spruill v. Gillis 372 F.3d 218, 223 (3d Cir.2004); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

Finally, a court must employ less stringent standards when considering pro se pleadings than when judging the work product of an attorney.  Haines v. Kerner, 404 U.S. 519, 520 (1972).  In a § 1983 action, the court must liberally construe the pro se litigant's pleadings and "apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name." Higgins v. Beyer, 293 F.3d 683, 688 (3d Cir. 2002) (quoting Holley v. Dep't of Veteran Affairs, 165 F.3d 244, 247-48 (3d Cir. 1999)).  See also Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996) ("Since this is a § 1983 action, the [pro se] plaintiffs are entitled to relief if their complaint sufficiently alleges deprivation of any right secured by the Constitution.") (quoting Higgins, 293 F.3d at 688 ).

2. <u>PLRA</u>

In addition, in the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), Congress adopted major changes affecting civil rights actions brought by prisoners in an effort to curb the increasing number of frivolous and harassing law suits brought by persons in custody. The authority granted to federal courts for *sua sponte* screening and dismissal of prisoner claims in that Act is applicable to this case. Specifically, Congress enacted a new statutory provision at 28 U.S.C. § 1915A, entitled "Screening," which requires the court to review complaints filed by prisoners seeking redress from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). If the complaint is "frivolous, malicious, or fails to state a claim upon which relief can be granted," or "seeks monetary relief from a defendant who is immune from such relief," the court must dismiss the complaint. 28 U.S.C. § 1915A(b).

Also, Congress significantly amended Title 28 of the United States Code, section 1915, which establishes the criteria for allowing an action to proceed *in forma pauperis* (IFP), *i.e.*, without prepayment of costs. Section 1915(e) (as amended) requires the federal courts to review complaints filed by persons that are proceeding IFP and to dismiss, at any time, any action that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B).

Further, the PLRA substantially amended the Civil Rights of Institutionalized Persons Act, 42 U.S.C.A. § 1997e. In this regard, the PLRA amended section 1997(c) to require the court "on its own motion or on the motion of a party" to dismiss any action brought by a prisoner with respect to prison conditions under 42 U.S.C. § 1983 if the action is "frivolous, malicious, fails to

state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." *See* 42 U.S.C. § 1997e(c)(1).

Plaintiff is considered a "prisoner" as that term is defined under the PLRA[1] and he is seeking redress from individuals employed by governmental entities. In addition, this Court granted Plaintiff's Motion to Proceed *In Forma Pauperis* on October 25, 2006 (doc. no. 2). Thus his allegations must be reviewed in accordance with 28 U.S.C. §§ 1915A & 1915(e). In reviewing complaints under 28 U.S.C. §§ 1915A & 1915(e), a federal court applies the same standard applied to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).[2] Notwithstanding, a plaintiff must allege specific facts supporting his claims to withstand dismissal for failure to state a claim. Brock v. St. Joseph's Hosp., 104 F.3d 358 (4th Cir. Dec. 23, 1996); Whitehead v. Becton, 1996 WL 761937 (D.C. Cir. 1996).

### B. Plaintiff's Allegations

In his lengthy Complaint, Plaintiff makes allegations against each defendant individually; consequently, his allegations are not in chronological order. His allegations are as follows.

1.      Superintendent Sobina

---

1. Sections 1915 and 1915A, as amended, define the term "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." *See* 28 U.S.C. §§ 1915(h); 1915A(c).

2. *See, e.g.*, Anyanwutaku v. Moore, 151 F.3d 1053 (D.C. Cir. 1998); Mitchell v. Farcass, 112 F.3d 1483, 1484 (11th Cir. 1997); Powell v. Hoover, 956 F. Supp. 564, 568 (M.D. Pa. 1997)(applying Rule 12(b)(6) standard to claim dismissed under 28 U.S.C. § 1915(e)(2)(B)(ii)); Tucker v. Angelone, 954 F. Supp. 134 (E.D. Va.), *aff'd*, 116 F.3d 473 (Table) (4th Cir. 1997).

On January 11, 2006, Plaintiff was informed that his outside clearance status for the Auto Shop had been revoked. He filed Grievance No. 141296 in regards to this matter (doc. no. 7-1, p. 36). When Plaintiff asked Defendant Sobina why his outside clearance status had been revoked, Sobina replied, "You run your mouth and you complain too much, so I believed you were a security risk. If you choose to litigate this matter, I'll defend my actions. I run this institution!" Plaintiff then filed Grievance 141517 alleging that Sobina's actions were retaliatory due to Plaintiff's filing Grievance 138918 against Sobina on December 30, 2005 (doc. no. 7-1, p.44).

On January 17, 2006, Plaintiff was told to pack his property as he was going to be transferred on Sobina's orders but this transfer was cancelled. On February 13, 2006, Plaintiff was again told to pack his belongings for another transfer under Sobina's orders, which also was cancelled. Plaintiff spoke to Sobina regarding the transfer, to which Sobina replied, "I thought I had you transferred this morning."

Plaintiff' cell was searched six times in one week in January of 2006. In February, March, and April his cell was searched forty-three times and his legal work was examined. When Plaintiff complained to officers, they laughed and said, "You shouldn't play with this Superintendent [Sobina] or his deputies with all the paper work you file." The officers told Plaintiff they were advised to "f --- with you and search your cell daily to see what you're up to per the Supt. and Deputy Barone."

During the week of April 17, 2006, while in the RHU for misconduct, Plaintiff was told by Sobina that he would make his misconduct disappear if Plaintiff dropped his grievances against him and promised not to sue him in any suits or any further grievances. Sobina also said that

if Plaintiff failed to do these things, he would remain in Western Pennsylvania and would not like where he would complete his sentence.

On May 8, 2006, Plaintiff was transferred to SCI-Cresson from SCI-Forest while serving disciplinary conduct (DC) time. Plaintiff had filed several private criminal complaints in the Marienville District Court on May 2, 2006, against staff for theft by deception and criminal conspiracy and amended the charges on May 24, 2006 to include "official oppression" against Defendant Sobina, Defendant Bill C. Dombrowski, and Defendant Jeffrey A. Beard for their retaliatory acts and violation of their Code of Ethics. While at SCI-Cresson, Plaintiff filed a grievance due to the law library missing sixty-five percent of the legal reference materials, CD-ROMs, and a typewriter, thus hindering his access to the courts. He was told that was the reason for his transfer was to prevent him from filing anything at SCI-Cresson while in the RHU due to their inadequate law library.

2.  Michael Barone

On January 10, 2006, Plaintiff spoke to Defendant Barone concerning a transfer closer to his home, to which Barone responded, "Yes! It is possible for you to be transferred closer to home; however, you need to stop complaining so much in the grievances you filed against your unit manager about dumb shit. We don't transfer pain-in-the-asses where they want to go, ok? We transfer them where they don't want to go and we put them so far in the hole that they can't be heard. Do I make myself clear? Do yourself a favor, you're new here, and withdraw the grievances you filed, so your stay here can be pleasant instead of unpleasant."

When asked in late January or early February 2006 about Plaintiff's job level and pay being modified along with his transfer to the D-Unit for no reason, Barone replied that there was no

reason for these changes.  Then he continued by saying that Plaintiff had not stopped making complaints, so he and other Defendants took away his position and that "no inmate deserves to be outside the prison to work especially with all [Plaintiff's] bullshit." (Doc. no. 7-1, p. 12.)  Barone also threatened to keep Plaintiff in the RHU until he maxed out claiming that he would personally make sure no one heard from him or answered his mail while he was in the Department of Corrections.  Plaintiff filed a grievance but did not get any reply.  While in the RHU during the Month of April, Defendant Barone spoke with Plaintiff about his numerous grievances telling him "when will you ever learn that I am no one to play with when it's too late?  Your grievances are annoying and ridiculous let alone time consuming.  Knock it the hell off will you!  Are you happy having your cell ripped apart every other day while here in the RHU and while you are on D Unit?  I'll stop when you stop." (Doc. no. 7-1, p. 12.)

      3.   <u>Major Hall</u>

      On January 10, 2006, Plaintiff spoke with Defendant Hall about his requests and letters about the discrimination in the I-unit.  Hall replied, "Stop making waves with my staff" and to stop filing "dumb shit every time something doesn't go your way."  He also said that he would get to him when he had time so to stop sending letters and requests.  On February 10, 2006 Hall told Plaintiff to stop contacting the administrators and himself and threatened to put him in the hole.  Hall told him that he had been removed from the "I" block because of his continuous complaints and ordered his cell to be searched and for the confiscation of several folders containing his legal work.

      On March 23, 2006, Major Hall entered D Unit with three officers and ordered the officers plus a block officer to rip Plaintiff's cell apart once again.  Cards and personal letters were taken as well as IFP forms.  On March 25, 2006, a major shake down of the prison was conducted

where two officers searched Plaintiff's cell and confiscated his foreign stamps. He then received a C.I.R. for contraband (all purpose cleaner) he never possessed. As a consequence, he received a frivolous misconduct. On April 1, 2006, Major Hall and other correctional officers came to Plaintiff's cell and conducted another search. Hall took Plaintiff's 1983 Complaint forms that had Hall's name on them telling Plaintiff he would not be needing them.

4. <u>Major Wojcik</u>

In January 2006 Defendant Wojcik communicated to Plaintiff that he was surprised he still was at SCI-Forrest due to his numerous complaints. Wojcik told Plaintiff he would be transferred next month even if he had to lie about it. During January and February of 2006, Plaintiff's cell was searched on several occasions on Wojcik's orders where either Wojcik or Hall or both were present. Wojnik and others confiscated Plaintiff's grievances and requests and did not return them until weeks later. A civil rights complaint naming Wojcik and others as defendants was confiscated and not returned. Plaintiff also was informed that his clearance was pulled due to his complaints. His cell was searched several more times in March 2006, and the notes he was keeping on everything that was happening to him were confiscated. Plaintiff filed a grievance thereafter.

5. <u>Unit Manager Penich</u>

On December 19, 2005, Defendant Penich, I Unit Manager, discriminated against Plaintiff when she made changes in the cell placements after Plaintiff had submitted a cell agreement with his former cellmate, Daniel Herdack, to Penich. Plaintiff, who had been in the same cell as Herdack, was moved for no reason. Herdack and Plaintiff approached Penich to ask for the rationale behind the changes in cell placement. She replied that Plaintiff would be moved back to his original cell in a few days, which never happened. Plaintiff filed a grievance, which was appealed to

Defendant Sobina on December 30, 2005. Sobina denied the grievance on January 6, 2006. This denial was affirmed on final review on April 18, 2006. Plaintiff claims Penich violated the Equal Protection Clause, his due process rights and his First Amendment Freedom of Speech when she, Major Hall, Major Wojcik, Barone, and Sobina retaliated against him for speaking out in his grievances.

6.    <u>Unit Manager Ennis</u>

On August 1, 2005 Plaintiff was transferred to SCI-Forest. Plaintiff was placed on E Unit where Defendant Ennis was the Unit Manager. Plaintiff met with Ennis and other staff members regarding his separations concerning co-defendants that Plaintiff had agreed to testify against in an upcoming criminal matter. Plaintiff told Ennis that there were about thirty co-defendants who had family members in the DOC who were seeking revenge against him because he cooperated as a witness for state and federal authorities. Ennis advised Plaintiff to submit a Request to Staff form concerning the matter and that he would go over any documentation Plaintiff had and would check the inmate roster at SCI-Forest to see if any of Plaintiff's co-defendants were present. Ennis never met with Plaintiff who had a run-in with three inmates, which he reported to prison officials so that separations could be made.

On May 8, 2006, Plaintiff was transferred to SCI-Cresson due to filing several criminal complaints against prison officials and speaking out in grievances. Ennis never entered the names Plaintiff had given him for the purpose of making separations in housing. Plaintiff claims had Ennis entered the names, the incident with the inmates would not have occurred and he would not have been transferred where these co-defendants were confined. On July 6, 2006, Plaintiff was transferred to SCI-Somerset where he was forced to confinement in Administrative Custody (AC)

because he arrived with a co-defendant's friend who figured out who he was.  He was transferred again to the Long Term Segregation Unit (LTSU) at SCI-Fayette in August 2006 due to pending litigation against prison officials.

       7.     <u>Unit Manager Dombrowski</u>

       On January 11, 2006, Plaintiff arrived on D-unit at SCI-Forest, where Defendant Dombrowski was the Unit Manager.  Dombrowski said "I don't play the grievance filing shit on this unit, ok?  All that lawsuit shit is done also.  Do I make myself clear, Mr. O'Connell?"  (Doc. no. 7-1, p. 19).  Plaintiff sent a request to Defendant Hall concerning this comment but did not receive a response.  On January 25, 2006, Dombrowski told Plaintiff to sign off on Grievance 141517, which Plaintiff refused.  Dombrowski proceeded to threateningly speak to Plaintiff for forty-five minutes on the matter and refused to recuse himself.  On February 11, 2006, Plaintiff was told by Dombrowski that he was General Labor Pool and his pay rate was reduced from .24 to .18 per hour.  On February 13, 2006,  Dombrowski expressed his surprise that Plaintiff had not been transferred since Dombrowski had formed a vote sheet to do so at the request of Defendant Barone and Defendant Sobina.

       On February 24, 2006, Dombrowski told Plaintiff to stop filing grievances.  When Plaintiff asked about a unit team hearing, Dombrowski told him  "You don't need a unit team meeting so stop trying to tell me how to do my job."  (Doc. no. 7-1, p. 19).  On March 21, 2006, Plaintiff tried to speak to Dombrowski regarding policy and procedure concerning DC-ADM 805 and 816, Dombrowski told him to "get the fuck out of my face.  You always want to debate stuff and I don't want to hear it "  *Id*.  On March 25, 2006, Plaintiff received a frivolous misconduct violation

for possession of cleaner, which he claims he did not possess. Several days later, Dombrowski said to him: "Awe, we're sorry to see you go" and laughed at him referring to the misconduct.

8.     <u>Grievance Coordinator and Superintendent Assistant Kennedy</u>

Plaintiff claims that during January and February of 2006, Defendant Kennedy deliberately delayed Plaintiff's grievance responses, which resulted in their ultimate denials for failure to appeal within the allotted time. Plaintiff claims that Defendant Kennedy, as well as other Defendants, denied him due process for failure to respond to numerous grievances (147866, 148361, 149504, 150393, 150497). Plaintiff also claims that Kennedy delayed his mail to Defendant Sobina in retaliation for Plaintiff's filing of a grievance against her. He further claims that she denied him access to courts when he could not file a Petition for Review in the Commonwealth Court to seek relief from a retaliatory misconduct for speaking out in several grievances.

9.     <u>Chief Grievance Officer Burks</u>

During the months of January through August 2005, Defendant Burks knowingly denied numerous grievances filed by Plaintiff in retaliation for him filing grievances against her. She denied him due process by not answering or denying his grievances.

10.     <u>DOC Secretary Beard</u>

Defendant Beard knowingly put Plaintiff's life in jeopardy by failing to properly train his staff in advising them about the proper Code of Ethics, resulting in the violations of directives and regulations by numerous staff and officers where Plaintiff is retaliated against for speaking out.

11.     <u>Transfer Tech Williamson</u>

Beginning in 2003, Defendant Williamson conspired with Defendant Beard and other officials named as Defendants in this action to obstruct Plaintiff's access to the courts by transferring

him numerous times to prevent him from getting relief in his habeas corpus action at Civil Action No. 04-1485 in violation of Federal Rule of Appellate Procedure 23(a), which states that the prisoner must not be transferred to another prison without leave of court. This also resulted in Plaintiff being placed in prisons in which many friends and family members of his co-defendants in his criminal trial sought revenge against Plaintiff for his cooperation with state and federal authorities. Plaintiff constantly was placed in administrative custody for months at a time due to seven retaliatory transfers since May of 2003.

12.    Pennsylvania Board of Probation and Parole Secretary and Acting Secretary

Next, Plaintiff claims that his parole hearing was not held in a timely manner. He also claims that the Board rendered its decision to deny him parole due to inaccurate, false, incomplete, and misleading information. Plaintiff claims that the Board's decision to deny him parole was arbitrary, capricious and retaliatory, due to Plaintiff's filing grievances, which resulted in various internal policy changes and reassignment of staff officials. He further claims that the parole agent, two Board members, and the Secretary and Acting Secretary violated his rights under the First, Fifth, Eighth and Fourteenth Amendments.[3]

13.    Superintendent Wilson

Plaintiff was transferred to SCI-Fayette from SCI-Somerset in August of 2006. At that time, Plaintiff was placed in administrative custody because no records were available to determine his custody level or housing needs. Plaintiff claims that this was untrue as he witnessed his medical records being transferred. On August 10, 2006, Plaintiff was seen by the program Review Committee (PRC) who informed him that he would be held in AC until Security reviewed

_____

3. Plaintiff does not name the parole agent or the two Board members as defendants in this action.

his case.  On August 14, 2006, Plaintiff sent an inmate request to Defendant Wilson concerning photo copies of documents he requested for his civil action pending in the Commonwealth Court of Pennsylvania regarding the denial of his parole.  On August 18, 2006, Plaintiff sent another request to Defendant Wilson due to a letter he received from a staff attorney in the Commonwealth Court advising him that he was required to serve a copy of his petition to the Attorney General.  Plaintiff sent another request to Defendant Wilson on August 23, 2006, pleading for assistance to receive the copies Plaintiff needed to comply with the advice of the staff attorney.  Plaintiff received a court order on August 28, 2006, advising him to comply with the order under threat of his case being dismissed.  On August 30, 2006, Wilson affirmed Plaintiff's housing status in AC.  On September 5, 2006, Plaintiff forwarded another request of staff to Wilson concerning legal documents needing to be copied in order to comply with the court order.  On September 11, 2006, Plaintiff filed Grievance No. 162232 against Wilson and others who knowingly, willful, and deliberately obstructed Plaintiff's access to the courts by not providing him with service, which also violated department directives.

14.    Grievance Coordinator and Superintendent Assistant Kushner

On September 6, 2006, Defendant Kushner knowingly, willingly, and deliberately placed Plaintiff on grievance restriction to prevent him from making further grievances.

15.    Deputy Burns

On August 10, 2003, Defendant Burns sat on a Program Review Committee, which held Plaintiff on AC status pending review of his case, although Plaintiff had explained his situation to him concerning his numerous cases pending in Pennsylvania.  In August 2006, Plaintiff sent Defendant Burns request slips for photocopies of a petition for review to be mailed to the Attorney

General of Pennsylvania. On September 6, 2003, Plaintiff sent another request to Burns asking about his custody and transfer status, to which Burns replied that he saw no reason to transfer him at that time. On September 11, 2006 Plaintiff filed a grievance against Burns and others for denying him access to the courts in a retaliatory manner.

16.    <u>Librarian Hammaker</u>

On August 18, 2006, Plaintiff sent fifty-six pages of legal documents to Defendant Hammaker at SCI-Fayette to be photocopied. He filed a grievance when those documents were not returned to him.

17.    <u>Inmate Accounts (Jane or John Doe) at SCI-Fayette</u>

Plaintiff requested assistance from Defendant Jane or John Doe in August and September of 2006 to serve a Petition for review on the Attorney General, and was denied requests for that service and for envelopes.

18.    <u>Joseph F. Trempus</u>

Plaintiff continually asked Defendant Trempus in August and September of 2006 for assistance in communications with the Attorney General, to which Defendant replied that he would have someone take care of it, which never happened. Defendant Trempus also made assurances that the legal documents would be taken care of, which were complete lies, as no one ever picked up the documents. Plaintiff complains that Defendant Tempus denied him access to courts by denying him copy service.

19.    <u>Unit Manager Michael Zaken</u>

On August 3, 2006, Plaintiff arrived at SCI-Fayette and was placed in administrative custody in the "L-unit," where Defendant Zaken was unit manager. From August to September

2006, Plaintiff made requests to Defendant Zaken for assistance in receiving copy service so that his case would not be dismissed, which went unanswered. Plaintiff complains that Defendant Zaken denied him access to courts by denying him copy service.

20. Captain Nickelson

In August 2006, Plaintiff made numerous requests to Defendant Nickelson for copy service so that he could comply with a court order and a letter from his staff attorney. Plaintiff's pleas for help were denied. Defendant never stopped by Plaintiff's cell to see if he had received his requested copies. Plaintiff complains that Defendant Nichelson denied him access to courts by denying him copy service.

21 & 22. L.T. Kremposky and L.T. Crumb of L-Unit

From August to September 2006, Plaintiff made numerous requests to Defendant Kremposky and Defendant Crumb for copy service assistance in order to comply with a court order and service on the Attorney General. The Defendants told Plaintiff that the matter would be resolved, but told Plaintiff that the approval of the unit manager was necessary before his copies could be made.

22. Office of the Attorney General

Plaintiff claims that although he has been in constant communication with the Attorney General of Pennsylvania, Mr. T. Corbett, about the numerous grievances and retaliation by Department of Corrections officials, there has been no action taken on his behalf.

**C. Liability under 42 U.S.C. § 1983**

Plaintiff's Complaint seeks to assert liability against Defendants pursuant to 42 U.S.C. § 1983. To state a claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements. He must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. West v. Atkins, 487 U.S. 42 (1988); Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, Daniels v. Williams, 474 U.S. 327, 330-331 (1986).

### D. The First Amendment

Several of the Plaintiff's allegations invoke the protections of the First Amendment, which provides as follows.

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. Amend. I.

1.  Access to Courts

Plaintiff alleges that Defendants violated his right to access to the courts by failing to make copies for him because he was indigent. In Christopher v. Harbury, 536 U.S. 403 (2002), the Supreme Court set forth specific criteria that a court must consider in determining whether a plaintiff has alleged a viable claim of right to access to the courts. Specifically, the Supreme Court held that, in order to state a claim for denial of access to courts, a party must identify all of the following in the complaint: 1) a non-frivolous, underlying claim: 2) the official acts frustrating the litigation; and 3) a remedy that may be awarded as recompense but that is not otherwise available in a future suit. Christopher, 536 U.S. at 415.

The Court explained that the first requirement mandated that the plaintiff specifically state in the complaint the underlying claim in accordance with the requirements of Rule 8(a) of the Federal Rules of Civil Procedure to the same degree as if the underlying claim was being pursued independently.  <u>Christopher</u>, 536 U.S. at 417.  In this regard, the statement must be sufficiently specific to ensure that the district court can ascertain that the claim is not frivolous and that the "the 'arguable' nature of the underlying claim is more than hope." *Id*. The second requirement requires a Plaintiff to clearly allege in the Complaint the official acts that frustrated the underlying litigation. Third, a Plaintiff must specifically identify a remedy that may be awarded as recompense in a denial-of-access case that would not be available in any other future litigation. *Id*. at 414.

It is clear from reviewing Plaintiff's Complaint that he has failed to allege a viable claim for denial of access to the courts.  In this regard, court records show that Plaintiff did not suffer any prejudice due to irregular service in that the Commonwealth Court reviewed his Petition on the merits.  Similarly, Plaintiff has not shown that he was denied access to courts due to any alleged inadequacies in any of the law libraries he had access to.  Consequently, Defendants' Motion should be granted as to this claim and Plaintiff's access to courts claims should be dismissed under the PLRA.[4]

    2.   <u>Retaliation</u>

---

4.  Furthermore, as Defendants correctly point out, states do not have to subsidize inmate litigation, civil or criminal; the inmate is responsible for managing his litigation within the constraints of his own fiscal means.  *See, e.g.*, <u>Lindell v. McCallum</u>, 352 F.3d 1107, 1111 (7th Cir. 2003) (holding that because an inmate has no constitutional entitlement to prosecute a civil suit; like any other civil litigant, he must decide which of his legal actions is important enough to fund); <u>Salkeld v. Tennis</u>, 2006 WL 2794222, *2 (M. D. Pa. 2006) (while "a state must provide prisoners an opportunity to send legal papers[ t]his does not mean … that prisoners have a constitutional right to unlimited free postage") (citations omitted).

Plaintiff also claims that the Defendants retaliated against him by: removing his outside clearance; participating and ordering abusive cell searches; transferring him to different institutions; failing to make copies of his legal papers, and keeping him confined in AC custody. These claims also invoke the protections of the First Amendment. In this regard, it is well settled that retaliation for the exercise of a constitutionally protected right is itself a violation of rights secured by the Constitution, which is actionable under section 1983. Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001); White v. Napoleon, 897 F.2d 103, 112 (3d Cir. 1990). However, merely alleging the fact of retaliation is insufficient; in order to prevail on a retaliation claim, a plaintiff must show three things: (1) the conduct which led to the alleged retaliation was constitutionally protected; (2) that he was subjected to adverse actions by a state actor (here, the prison officials); and (3) the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. See Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997).

If the plaintiff proves these three elements, the burden shifts to the state actor to prove that it would have taken the same action without the unconstitutional factors. Mt. Healthy, 429 U.S. at 287. "This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334. Because retaliation claims can be easily fabricated, district courts must view prisoners' retaliation claims with sufficient skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner. See Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); Woods v. Smith, 60 F.3d

1161, 1166 (5th Cir. 1995), *cert. denied*, 516 U.S. 1084 (1996); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

A prisoner's ability to file grievances and lawsuits against prison officials is a protected activity for purposes of a retaliation claim. *See* Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d Cir. 1981) (retaliation for exercising right to petition for redress of grievances states a cause of action for damages arising under the constitution); Woods, 60 F.3d at 1165 (prison officials may not retaliate against an inmate for complaining about a guard's misconduct). Plaintiff claims that the retaliation was the result of his filing grievances and complaints. Thus, he had alleged the first element of a retaliation claim.

With respect to the second element, the Plaintiff alleges that he was: 1) removed from his outside clearance; 2) subjected to abusive cell searches; 3) transferred to different institutions; 4) kept in AC custody; and 5) refused free copies of his legal paper. As least as to the first four claims, under the objective standard required by Rauser, at this juncture, this Court may conclude that Plaintiff has alleged the second element of a retaliation claim, *i.e.*, that he was subjected to "adverse" action. *See* Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2002) (holding that prisoner's allegation that he was falsely charged with misconduct in retaliation for filing complaints against a correctional officer sufficiently alleged a retaliation claim); Allah, 229 F.3d at 225 (holding that an allegation that a prisoner was kept in administrative segregation to punish him for filing civil rights complaints stated a retaliation claim).

The third element of a retaliation claim requires the plaintiff to show that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. This "motivation" factor may be established by alleging a chronology of events from which

retaliation plausibly may be inferred. Tighe v. Wall, 100 F.3d 41, 42 (5th Cir. 1996); Goff v. Burton, 91 F.3d 1188 (8th Cir. 1996); Pride v. Peters, 72 F.3d 132 (Table), 1995 WL 746190 (7th Cir. 1995). It is Plaintiff's burden to prove that the Defendants were motivated by retaliation. Hannon v. Speck, 1988 WL 131367, at *4 (E. D. Pa. Dec. 6, 1988) ("In bringing a § 1983 action alleging such retaliation, an inmate faces a substantial burden in attempting to prove that the actual motivating factor ... was as he alleged.") (internal quotes and citation omitted), aff'd, 888 F.2d 1380 (3d Cir. 1989) (Table).

With respect to the first claim, i.e., that he was stripped of his outside clearance, the record evidence does not establish the essential third element, i.e., that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. In this regard, Plaintiff's own documents indicate that Plaintiff's outside clearance was revoked because he was considered a security threat (doc. no. 7-1, p.39). Because this demonstrates that the state actors would have taken the same action without the unconstitutional factors, Plaintiff can not prevail on his first retaliation claim and Defendants are entitled to judgment as a matter of law with respect to this claim.

In his second claim, he alleges that Defendants Sobina, Barone, Hall and Wojcik either ordered or participated in abusive cell searches during January through April of 2006 while he was confined at SCI-Forest. Specifically, Plaintiff alleges that his cell was searched six times in one week in January of 2006 and that in February, March, and April of 2006, his cell was searched forty-three times. When Plaintiff complained to officers, they laughed and said, "You shouldn't play with this Superintendent [Sobina] or his deputies with all the paper work you file." The officers told Plaintiff they were advised to "f --- with you and search your cell daily to see what you're up to per

the Supt. and Deputy Barone." (Doc. No. 7-1, p.10.) He claims that Defendant Barone specifically

told him that he would stop ripping his cell apart if he stopped filing grievances. (Doc. No. 7-1, p.

12). He alleges that Defendants Hall and Wojcik ordered his cell to be searched and confiscated his

grievances, civil rights complaint and personal notes because of his continuous complaints. (Doc.

No. 7-1, p. 13-14). Here, Plaintiff allegations suggest that Defendants Sobina, Barone, Hall and

Wojcik ordered or participated in adverse action, *i.e.*, excessive and abusive cell searches, which

was motivated by Plaintiff's actions in utilizing the DOC grievance procedures and filing complaints

against DOC officials. Thus, at this stage of the proceedings, Plaintiff is entitled to go forward with

this claim and Defendants' Motion to Dismiss should be denied as to this claim against Defendant

Sobina. *Accord* Kwanzaa v. Brown, 2007 WL 1749878, *8 (D.N.J. June 15, 2007).[5]

       Plaintiff's third retaliation claim is that he was transferred to different institutions due

to his numerous grievances and complaints against DOC officials. Specifically, however, Plaintiff's

allegations only name Defendant Sobina as a person responsible for transferring him due to his

complaints and that he was transferred to SCI-Cresson on May 8, 2006 when he was serving time

in disciplinary custody after he had filed criminal complaints against DOC officials at SCI-Forest

on May 2, 2006. Again, at this juncture, Plaintiff has sufficiently pled a retaliation claim as to

Defendant Sobina as to his transfer from SCI-Forest to SCi-Cresson on May 8, 2006.[6] Assuming

---

5. Notwithstanding, Plaintiff's cell search claim can not be maintained as a Fourth Amendment violation as the Fourth Amendment's proscription against unreasonable searches does not apply to a prisoner's cell or to prisoner's property. *See* Hudson v. Palmer, 468 U.S. 517, 526 (1984) (holding that an inmate has no reasonable expectation of privacy in his prison cell entitling him to the protections of the Fourth Amendment).

6. Plaintiff further alleges that he Plaintiff was transferred to SCI-Somerset on July 6, 2006 where he was forced to confinement in AC and that he was transferred again to the Long Term Segregation Unit (LTSU) at SCI-Fayette in August 2006 due to pending litigation against prison

(continued...)

that Plaintiff has not procedurally defaulted this claim, Defendant Sobina can prevail on this claim if he is able to show a legitimate penological reason for Plaintiff's transfer.

Plaintiff's fourth retaliation claim is that he was kept in AC custody. Here again the record evidence does not establish the essential third element, *i.e.*, that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. In this regard, official DOC documents show that Plaintiff was kept in AC due to his activities in acting as an informant for the United States Attorney Generals Office and testifying against his co-defendants. In a Confidential Memo dated December 5, 2006, it was noted that many of the people convicted due to O'Connell's testimony were part of an gang from Philadelphia who had many members and family members or friends in various DOC institutions throughout the Commonwealth. Thus, it was concluded that any institution that Plaintiff would be transferred to and placed in general population he would come into contact with either gang members or their family members. Consequently, it was recommended that Plaintiff remain on AC status and be placed on the Do No Release List (doc. no. 17-2, p.15). Because the record shows a legitimate penological reason for Plaintiff's AC custody status, he can not maintain any retaliation claim in that regard.

Plaintiff's final retaliation claim is that he was refused free copies of his legal papers. For Plaintiff to plead causation, he must allege that his protected activity, here the filing grievances and lawsuits, caused the retaliatory act of refusing to copy his legal papers. The acts of which he complains occurred in August and September of 2006 after he was transferred to SCI-Fayette. This

---

6(...continued)
officials. However, because he does not allege who was personally responsible for these transfers, his retaliation claims as to these transfers should not go forward. Plaintiff's own documents reveal that he was informed that transfers are initiated at the institutional level (doc. no. 35-2, p.1).

was two months after Plaintiff filed his criminal complaints and grievances at SCI-Forest and is too great a delay between events to support an inference of causality. *See, e.g.*, Miller v. Brown, 2007 WL 1876506, at *8 (D.N.J. June 27 2007) (stating "[t]emporal proximity may satisfy ... the causation element [of a retaliation claim], only when 'the timing of the alleged retaliatory action [is] 'unusually suggestive' of retaliatory motive") (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997)).  Moreover, Plaintiff had not filed grievances against the defendants involved in this claim until after the events complained of.  Thus, he has not alleged that the exercise of his constitutional rights was a substantial or motivating factor in the alleged decisions not to make his requested copies.  Thus, to the extent that Plaintiff even has exhausted his mandatory administrative remedies regarding this claim, it should be dismissed for failure to state a claim upon which relief may be granted.

### E. Fourteenth Amendment

Plaintiff also claims that Defendants violated his rights as protected by the Fourteenth Amendment, which prohibits the state from depriving an individual of a constitutionally protected interest without due process of law.  The Due Process Clause was promulgated to secure the individual from the arbitrary exercise of the powers of government.  The "procedural" aspect of the Due Process Clause requires the government to follow appropriate procedures to promote fairness in governmental decisions; the "substantive" aspect of the Clause bars certain government actions regardless of the fairness of the procedures used to implement them so as to prevent governmental power from being used for purposes of oppression.  Daniels v. Williams, 474 U.S. 327, 329-33 (1986).  (citations omitted.)

The Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on a prisoner. Meachum v. Fano, 427 U.S. 215, 224 (1976). The Due Process Clause shields from arbitrary or capricious deprivation only those facets of a convicted criminal's existence that qualify as "liberty interests." Hewitt v. Helms, 459 U.S. 460 (1983); Morrissey v. Brewer, 408 U.S. 471 (1972). The types of protected liberty interests are not unlimited. The interest must rise to more than an abstract need or desire and must be based on more than a unilateral hope. Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it. Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979) (citation omitted).

Thus, the threshold question presented by Plaintiff's claims is whether Defendants' actions impacted a constitutionally-protected interest. A liberty interest may arise either from the Due Process Clause itself, or from a statute, rule, or regulation. Hewitt, 459 U.S. at 466. A liberty interest inherent in the Constitution arises when a prisoner has acquired a substantial, although conditional, freedom such that the loss of liberty entailed by its revocation is a serious deprivation requiring that the prisoner be accorded due process. Gagnon v. Scarpelli, 411 U.S. 778, 781 (1973). Interests recognized by the Supreme Court that fall within this category include the revocation of parole, Morrissey, 408 U.S. at 471, and the revocation of probation, Gagnon, 411 U.S. at 778. The Due Process Clause, however, does not create an inherent liberty interest to remain free from administrative segregation. *See, e.g.*, Hewitt, 459 U.S. at 468; Wolff, 418 U.S. at 556; Montayne v. Haymes, 427 U.S. 236, 242 (1976); Sheehan v. Beyer, 51 F.3d 1170, 1175 (3d Cir. 1995); Layton v. Beyer, 953 F.2d 839, 845 (3d Cir. 1992). Nor does it create an inherent liberty interest guaranteeing housing in a particular penal institution or providing protection against transfer from

one institution to another within the state prison system.  Meachum v. Fano, 427 U.S. 215 (1976);

Montanye v. Haymes, 427 U.S. 236 (1976).  Accordingly, Plaintiff can succeed under the Due

Process Clause only if state law or regulation has created a constitutionally-protected liberty interest.

      1.     Conditions of Confinement

      Plaintiff claims that Defendants violated his rights by revoking his outside work

clearance, failing to honor his cellmate request, transferring him to different institutions, and by

keeping him confined in AC.  Resolution of these claims is dictated by referring to the United States

Supreme Court's opinion in Sandin v. Conner, 515 U.S. 472 (1995).  In Sandin, the Supreme Court

pronounced a new standard for determining whether prison conditions deprive a prisoner of a liberty

interest that is protected by due process guarantees.  Specifically, the Supreme Court held that prison

conditions do not impact a protectable liberty interest unless they result in an "atypical and

significant hardship on the inmate in relation to the ordinary incidents of prison life."  Sandin,

515 U.S. at 483 (emphasis added).

      The Court of Appeals for the Third Circuit specifically has held that prisoners do not

have a liberty interest in remaining in a work release program under the analysis set forth in Sandin

v. Conner, 515 U.S. 472 (1995).  *See* Asquith v. Department of Corrections, 186 F.3d 407, 411 (3d

Cir. 1999).  Thus, Plaintiff has no due process claim for the revocation of his outside work release

status.  Similarly, Pennsylvania prisoners do not have any state created interest in specific housing.

Johnson v. Hill, 910 F.Supp. 218, 220 (E. D. Pa. 1996) (holding that prisoner placement is a matter

of prison administration and a prisoner has no constitutional right to be placed in any particular cell

or housing unit).  Moreover, Pennsylvania code clearly states that an inmate does not have a right

to be housed in a particular facility.  *See* 37 Pa.Code § 93.11(a).  Thus, Plaintiff has no state created

liberty interest to be incarcerated in a particular institution.  Jerry v. Williamson,  211 Fed.Appx. 110, 112, 2006 WL 3741840, *2 (3d Cir. December 20, 2006). Accordingly, Defendants are entitled to judgment as a matter of law as to these claims.

Plaintiff also claims he is being indefinitely housed in AC.  In Shoats v. Horn, 213 F.3d 140 (2000), the Court of Appeals for the Third Circuit determined that DOC's periodic review procedures as outlined in DOC policy statement 802 complied with constitutional due process requirements for keeping inmates confined in AC.  In the case at bar, the record shows that Plaintiff is confined in AC for his protection from gang members who he testified against and their family members.  Plaintiff does not claim that he has not received his periodic PRC reviews.  Thus, Plaintiff's continued confinement in AC comports with the procedural due process requirements upheld by the Court of Appeals for the Third Circuit in Shoats.  Whether this Court agrees with DOC's determination is not relevant to the question of whether Plaintiff's constitutional rights have been violated.  It is not the prerogative of the Court to second guess prison officials' interpretations of security issues.[7]  Consequently, Plaintiff does not state any violation of due process with respect to his continued placement in AC.

2.     False Misconduct Reports

Plaintiff also asserts that Defendants violated his constitutional rights by filing a false misconduct report.  A prisoner does not have a constitutional right to be free from being falsely or wrongly accused of conduct that may result in the deprivation of a protected liberty interest.

_____

7. *See, e.g.*, Rhodes v. Chapman, 452 U.S. 337, 349 n. 14 (1981) ("a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators").

<u>Freeman v. Rideout</u>, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988). In other words, the mere filing of false charges against an inmate does not constitute a *per se* constitutional violation. *Id*. Before the Supreme Court handed down its opinion in <u>Sandin</u>, the federal courts had determined that the filing of unfounded administrative charges against an inmate may result in a procedural due process violation <u>only</u> when such charges were not subsequently reviewed in a hearing. *Id*. at 952 (an allegation that a prison guard planted false evidence fails to state a claim where the procedural due process protections as required in <u>Wolff v. McDonnell</u> are provided) (citation omitted). Thus, even if false charges impaired a protected liberty interest, as long as prison officials granted the inmate a hearing and an opportunity to be heard, the filing of unfounded charges did not give rise to a procedural due process violation actionable under section 1983. *Accord* <u>Smith v. Mensinger</u>, 293 F.3d 641, 654 (3d Cir. 2002); <u>Jones v. Coughlin</u>, 45 F.3d 677 (2d Cir. 1995); <u>Franco v. Kelly</u>, 854 F.2d 584, 587 (2d Cir. 1988); <u>McClean v. Seclor</u>, 876 F. Supp. 695 (E.D. Pa. 1995).

In light of the Supreme Court's ruling in <u>Sandin</u>, however, Plaintiff has not even demonstrated that he had a constitutionally protected liberty interest that was offended by Defendants' actions in allegedly issuing false reports. Thus, it is unlikely that the filing of false charges, even in the absence of a hearing, would state a constitutional claim on the facts before this Court. *See* <u>Smith v. Mensinger</u>, 293 F.3d 641, 653 (3d Cir.2002) (holding that the district court correctly dismissed due process claim where allegation of false disciplinary report resulting in seven months' disciplinary confinement was not sufficient to constitute a due process deprivation under <u>Sandin</u>).

3.    <u>Failure to Follow DOC Policy</u>

Plaintiff also alleges that Defendants violated his due process rights by failing to follow DOC policy. Plaintiff misunderstands his due process rights. Federal and state regulations in and of themselves do not create a liberty interest in that procedure. *See, e.g.*, Hewitt v. Helms, 459 U.S. at 471 (mere fact of careful procedural structure to regulate use of administrative segregation does not indicate existence of protected liberty interest); McLaurin v. Morton, 48 F.3d 944, 947 (6th Cir. 1995) (mere procedures do not create any substantive liberty interest, even when phrased in mandatory language); Culbert v. Young, 834 F.2d 624, 628 (7th Cir. 1987) (the adoption of mere procedural guidelines does not give rise to a liberty interest), *cert. denied*, 485 U.S. 990 (1988); McGuire v. Forr, 1996 WL 131130 (E. D. Pa. Mar. 21, 1996) (holding that inmate grievance procedures, in themselves, do not confer a liberty interest protected by the due process clause in the inmate grievance procedures), *aff'd*, 101 F.3d 691 (3d Cir. 1996). Thus, failure to follow DOC policy does not, in and of itself, result in a violation of due process.

4.  Grievance Procedures

Plaintiff also asserts due process claims against Defendants based on their denials of his grievances. It is well established that inmate grievance procedures, in themselves, do not confer a liberty interest protected by the Due Process Clause. McGuire v. Forr, 1996 WL 131130 (E. D. Pa. Mar. 21, 1996), aff'd 101 F.3d 691 (3d Cir.1996); Leavitt v. Allen, 46 F.3d 1114 (Table), 1995 WL 44530 (1st Cir. Feb. 3, 1995). Furthermore, prison regulations that establish a grievance procedure cannot give rise to a liberty interest because they confer only procedural protections, not substantive rights, upon the inmates who may use the grievance procedures. *See* Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7th Cir. 1996); Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994); Mann v. Adams, 855 F.2d 639, 640 (9th Cir.), *cert. denied*, 488 U.S. 898 (1988); Wilson v. Horn, 971 F.

Supp. 943, 947-48 (E.D. Pa. 1997), *aff'd*, 142 F.3d 430 (3d Cir. 1998). Accordingly, Plaintiff's allegations that Defendants failed to properly investigate, process, and/or consider his grievances do not state a claim upon which relief may be granted under 42 U.S.C. § 1983. Burnside v. Moser, 138 Fed. Appx. 414, 416 (3d Cir. 2005).

5.    Pay

A prisoner has no constitutionally protected right to a prison job or a particular prison wage. Izard v. Blair, 173 F.3d 429, 1999 WL 96747, * 2 (6th Cir. 1999); Bulger v. U.S. Bureau of Prisons, 65 F.3d 48, 49 (5th Cir. 1995) (holding that prisoners "have no constitutionally protected liberty or property interests per se in their prison job assignments"); Flittie v. Solem, 827 F.2d 276, 279 (8th Cir.1987); Bryan v. Werner, 516 F.2d 233 (3rd Cir. 1975). Thus, because Plaintiff does not have a constitutional right to be assigned a particular job or to receive a particular wage, his claims regarding reduction of pay fail to state a claim upon which relief may be granted.

6.    Parole Hearing Procedures

Next, Plaintiff complains he was denied due process in regards to his application for release on parole. First, he complains that the Board failed to hold his parole hearing in a timely manner. Second, he claims that the Board relied on inaccurate information in his file regarding a detainer that was removed six months prior to his parole hearing. Plaintiff claims that these actions violated his right to due process. However, his assertions, taken as true, do not state a violation of his due process rights, either procedurally or substantively.

It long has been held that the granting of parole prior to the expiration of a prisoner's maximum term is not a constitutionally-protected liberty interest that is inherent in the Due Process Clause. Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979).

Moreover, the Pennsylvania Probation and Parole Act, 61 Pa. Stat. 331.1, *et. seq.*, does not grant Pennsylvania state prisoners any constitutionally-protected liberty interest in being released on parole prior to the expiration of their maximum terms.[8] Pennsylvania law <u>unambiguously</u> provides that a prisoner is <u>not entitled</u> to release from prison until the expiration of his maximum sentence.[9] Nothing in the Pennsylvania Parole Act (or any other provision of Pennsylvania law) requires the Board to release a prisoner on parole prior to the expiration of his maximum term. The Board has complete discretion to determine whether an inmate is sufficiently rehabilitated such that he will be permitted to serve the remainder of his sentence outside the prison walls on parole. Although a prisoner is <u>eligible</u> for parole at the end of his minimum term, nothing in Pennsylvania law or the United States Constitution requires a prisoner to be released at such time.[10]

As recently noted by the Court of Appeals for the Third Circuit:

> The Parole Board's consideration of Thorpe's parole applications is sufficient for Fourteenth Amendment due process purposes because "[t]here is no constitutional right or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." <u>Conn. Bd. of Pardons v. Dumschat</u>,

---

8. *See, e.g.*, <u>McFadden v. Lehman</u>, 968 F. Supp. 1001, 1004 (M.D. Pa. 1997) (Pennsylvania has not created an enforceable liberty interest in parole, rehabilitative pre-release programs, or in therapy programs); <u>Rodgers v. Parole Agent SCI-Frackville, Wech</u>, 916 F. Supp. 474, 476 (E.D. Pa. 1996); <u>McCrery v. Mark</u>, 823 F. Supp. 288 (E.D. Pa. 1993); <u>Rogers v. Pennsylvania Bd. of Probation and Parole</u>, 555 Pa. 285, 724 A.2d 319 (1999) (holding that the grant of parole for Pennsylvania prisoners is nothing more than a possibility; it merely constitutes favor granted by the state as a matter of grace and mercy).

9. A prisoner's sentence is his maximum term. <u>Krantz v. Pennsylvania Bd. of Probation & Parole</u>, 86 Pa. Commw. 38, 41, 483 A.2d 1044, 1047 (1984). The significance of the minimum sentence is that it establishes a parole eligibility date; the only "right" that can be asserted upon serving a minimum sentence is the "right" to apply for parole and to have that application duly considered by the Board. *Id*.

10. The existence of a state parole system alone does not create a constitutionally-protected interest. <u>Board of Pardons v. Allen</u>, 482 U.S. 369, 373 (1987).

452 U.S. 458, 464 (1981) (quoting <u>Greenholtz v. Inmates of Neb. Penal. & Corr. Complex</u>, 442 U.S. 1, 7 (1979)). While "States may under certain circumstances create liberty interests which are protected by the Due Process Clause," <u>Sandin v. Conner</u>, 515 U.S. 472, 483-84 (1995), the Pennsylvania Supreme Court has long held that "a denial of parole does not implicate a constitutionally protected liberty interest." <u>Coady v. Vaughn</u>, 564 Pa. 604, 770 A.2d 287, 291 (Pa. 2001); *see also* <u>Rogers v. Pa. Bd. of Prob. & Parole</u>, 555 Pa. 285, 724 A.2d 319, 322-23 (Pa. 1999) (affirming Parole Board's discretion to grant or deny parole because "parole is a matter of grace and mercy shown to a prisoner who has demonstrated to the Parole Board's satisfaction his future ability to function as a law-abiding member of society upon release before the expiration of the prisoner's maximum sentence").

<u>Thorpe v. Grillo</u>, 80 Fed. Appx. 215, 219, 2003 WL 22477890, 3 (3d Cir. 2003).

The discussion above makes clear that Plaintiff does not have a constitutionally-protected liberty interest in release on parole that arises under state law. Because a Pennsylvania prisoner has no liberty interest in obtaining parole, he cannot complain of the constitutionality of procedural devices attendant to parole decisions. <u>Burkett v. Love</u>, 89 F.3d 135, 141 (3d Cir. 1996); <u>Rodgers v. Parole Agent SCI-Frackville, Wech</u>, 916 F. Supp. 474, 476 (E.D. Pa. 1996).

The constitutional right to "substantive due process" protects individuals against arbitrary governmental action, regardless of the fairness of the procedures used to implement them.[11] Several courts, including the Court of Appeals for the Third Circuit, recognize that, even though an inmate has no protectable liberty interest in parole that implicates procedural due process, his substantive due process rights may be violated if parole is denied by arbitrary government action.[12]

---

11. *See also* <u>Collins v. Harker Heights</u>, 503 U.S. 115, 126 (1992) (the Due Process Clause was intended to prevent government officials from abusing power, or employing it as an instrument of oppression); <u>Wolff v. McDonnell</u>, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government.").

12. *See, e.g.*, <u>Monroe v. Thigpen</u>, 932 F.2d 1437, 1442 (11th Cir. 1991); <u>Newell v. Brown</u>, 981
(continued...)

In this regard, courts have determined that decisions to grant or deny parole may violate a prisoner's right to substantive due process if such decisions are based on arbitrary and capricious factors. The Supreme Court has declined to set forth a precise rule that defines the scope of impermissible "arbitrary" conduct for purposes of applying the substantive component of the Due Process Clause. Nonetheless, the Court recently clarified that governmental conduct does not violate a person's substantive due process rights unless it amounts to an abuse of official power that "shocks the conscience." County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).

Liberally construed and taken as true, Plaintiff does not state a violation of his substantive due process rights with respect to the Board's action in refusing to grant his parole application. As stated above, the Board is vested with broad discretion to grant or deny parole. In making such decisions, the Board's foremost consideration is the protection of the safety of the public. 61 Pa. Stat. §331.1. In granting parole, the Board is required to consider the nature and character of the offense committed, the general character and history of the prisoner, the written or personal statement or testimony of the victim or victim's family, and the recommendations of the trial judge, the district attorney and of each warden or superintendent who has had control over the applicant. 61 Pa. Stat. § 331.19. Moreover, the Board is prohibited from granting parole unless the Commonwealth will not be injured thereby. *See* 61 Pa. Stat. § 331.21(a).

In denying a prisoner's substantive due process claim in a similar context, the United States District Court for the Eastern District of Pennsylvania held as follows.

In Pennsylvania, the Board, in exercising its discretion, is expressly directed to investigate the "mental and behavior condition

12(...continued)
F.2d 880, 886 (6th Cir. 1992), *cert. denied*, 510 U.S. 842 (1993); Block v. Potter, 631 F.2d 233, 236 (3d Cir. 1980); Carter v. Kane, 938 F. Supp. 282 (E.D. Pa. 1996).

and history" of a parole applicant and to consider the "character of the offense committed." 61 Pa.C.S.A. § 331.19. These criteria bear a rational relation to rehabilitation and deterrence. The reasons given by the Board for denial of parole--(1) substance abuse, (2) assaultive instant offense, (3) very high assaultive behavior potential, (4) victim injury, and (5) your [Plaintiff's] need for counseling and treatment--and the documents reviewed by the Board, disclosed that it considered those factors in exercising its discretion. The Court does not find that there has been any abuse of discretion.

Bonilla v. Vaughn, 1998 WL 480833, at *10 (E. D. Pa. Aug. 14, 1998).

By notice dated November 23, 2004, the Board issued the following decision in regards to Plaintiff's parole application.

Following an interview with you and a review of your file, and having considered all matters required pursuant to the Parole Act of 1941, as amended, 61 P.S. § 331.1 et seq., the Board of Probation and Parole, in the exercise of its discretion, has determined at this time that: Your best interests do not justify or require you being paroled/reparoled; and, the interests of the Commonwealth will be injured if you were paroled/reparoled. Therefore, you are refused parole/reparole at this time. The reasons for the Board's decision included the following.

The recommendation made by the Department of Corrections.

Reports, evaluations and assessments concerning your physical, mental and behavior condition and history.

Other factors deemed pertinent in determining that you should not be paroled: Uncertain Detainer Status.

You will be reviewed in or after November, 2005.

At your next interview, the Board will review your file and consider:

Whether you have participated in completed a treatment program for: prescriptive program plan.

Whether you have received a favorable recommendation for parole from the Department of Corrections.

Detainer status to be available at time of review.

Notice of Board Decision (doc. no. 35, pp. 36-37).

In Plaintiff's case, the Board's reasons for denying his parole application are, on the face of them, in accordance with its statutory mandate to protect the well being of the Commonwealth's citizens (doc. no. 35, pp. 47-48). Without a doubt, the safety of the public and the interests of the Commonwealth are injured by releasing prisoners who require additional treatment programs or other types of counseling. In reviewing the Board's exercise of discretion in denying an application for parole, this Court's only role "is to insure that the Board followed criteria appropriate, rational and consistent with the statute and that its decision is not arbitrary and capricious nor based on impermissible considerations." Block, 631 F.2d at 236.

The Board identified legitimate reasons for exercising its discretion in denying Plaintiff's applications for early release from prison. In considering Plaintiff's ability to serve the remainder of his prison sentence on parole, the Board followed its statutory directive. Plaintiff does not allege that he was denied parole based on unconstitutional criteria such as race or religion. Instead, he complains that the Board relied on erroneous information, namely, a detainer that was removed on April 23, 2004, seven months before his parole hearing. Plaintiff misunderstands his due process rights. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect decisions. Bishop v. Wood, 426 U.S. 341, 350 (1976), *overruling on other grounds as recognized in* Whims v. Harbaugh, 139 F.3d 897 (4th Cir. 1998) (Table, Text in Westlaw); Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994) (applying rule of Bishop v. Wood in a prisoner case); Palmigiano v. Mullen, 491 F.2d 978, 980 (1st Cir. 1974)("There is no federally-protected right to a particular classification nor even to an error-free decision by the state authorities. The

Constitution does not assure uniformity of decisions or immunity from merely erroneous action, whether by the courts or the executive agencies of a state.'") (quoting <u>Snowden v. Hughes</u>, 321 U.S. 1, 15 (1944) (Frankfurter, J., concurring)); <u>Tansy v. Mondragon</u>, 52 F.3d 338 (Table), 1995 WL 216926, *5 (10th Cir. 1995) ("Even assuming that some of the allegations against Mr. Tansy were inaccurate, this does not establish a factual dispute as to whether he was deprived of substantive due process."). That a factual error may have occurred in the course of Plaintiff's parole determination simply does not shock this court's conscience. That this is the case should not be surprising. If it does not offend the Constitution that an innocent man is convicted of a crime and made to suffer imprisonment, and the Supreme Court has determined that it does not so offend, (*see* <u>Herrera v. Collins</u>, 506 U.S. 390, 400, 404 (1993) (holding that a claims of actual innocence based on newly discovered evidence is not itself a constitutional claim"), then *a fortiori*, the fact that a convicted prisoner is "mistakenly" refused parol does not, merely because the determination is mistaken, violate the Constitution.

Moreover, Plaintiff's erroneous detainer was not the sole or even primary reason for denying Plaintiff release on parole. The first reason listed by the Board is the DOC's unfavorable recommendation. That alone is sufficient to uphold the Board's decision. *Accord* <u>Shaffer v. Meyers</u>, 338 F.Supp.2d 562, 566 (M.D. Pa. 2004) ("On the basis of the record before the court, and the stated reasons for the Parole Board's denial of parole, the court concludes that there was a rational basis for the denial of parole.").[13]

### F. Personal Liability

---

13. Moreover, Plaintiff again was denied parole on March 23, 2006 (doc. no. 35, pp. 47-48). The reasons cited included Plaintiff's minimiization of the nature and circumstances of the offense, his lack of remorse, and his interview with the hearing examiner.

Plaintiff further attempts to assert liability against the Attorney General, the Parole Board Secretary and Acting Secretary and DOC Secretary Beard. To establish personal liability against a defendant in a section 1983 action, that defendant must have <u>personal</u> involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*. <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976). Accordingly, individual liability can be imposed under section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988); <u>Chinchello v. Fenton</u>, 805 F.2d 126, 133 (3d Cir. 1986). Personal involvement by a defendant can be shown by alleging either personal direction or actual knowledge and acquiescence in a subordinate's actions. <u>Rode</u>, 845 F.2d at 1207. "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Id*. *See also* <u>Evancho v. Fisher</u>, 423 F.3d 347, 353 (3d Cir. 2005). Moreover, in order to maintain a claim for supervisory liability, a plaintiff must show: 1) that the supervising official personally participated in the activity; 2) that the supervising official directed others to violate a person's rights; or 3) that the supervising official had knowledge of and acquiesced in a subordinates' violations. *See* <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1293 (3d Cir. 1997); <u>Baker v. Monroe Twp.</u>, 50 F.3d 1186, 1190-91 (3d Cir. 1995).

"A civil rights complaint is adequate where it states the conduct, time, place, and persons responsible." <u>Evancho v. Fisher</u>, 423 F.3d at 353. As Defendants point out, Plaintiff's Complaint fails to allege facts that, if proven, would show that Defendants Beard, the Attorney General and the Parole Board Secretary and Acting Secretary had any personal involvement in the alleged violations of Plaintiff's constitutional rights. *Id*. (" Evancho's amended complaint fails to allege facts that, if proven, would show Attorney General Fisher's personal involvement in

Evancho's transfer.").  Neither does Plaintiff's assertion that he sent the Attorney General letters informing him of his complaints.  *See* <u>Bullock v. Horn</u>, 2000 WL 1839171, *5 ((M.D. Pa., Oct. 31, 2000) ("Merely asserting that Plaintiff sent letters to these two defendants will not suffice.  Indeed, it would be anomalous to suggest that a prisoner could name as a Defendant any governmental official whatsoever, no matter how far removed in the chain of authority from the actual conduct in question, simply by sending that official a letter.").  Similarly, Plaintiff's allegations that Defendant Beard is liable for his failure to adequately train Defendants are conclusory and insufficient to allege liability under 42 U.S.C. § 1983 as a matter of law.  <u>Brown v. Muhlenberg Township</u>, 269 F.3d 205, 216 (3d Cir. 2001) (holding that, to establish liability on a failure to train theory, a plaintiff must set forth specific allegations that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference) (citing <u>City of Canton</u>, 489 U.S. at 390).  Finally, as Defendants point out, the filing of a grievance is not sufficient to show the actual knowledge necessary for personal involvement.  <u>Rode</u>, 845 F.2d at 1208.

## G. Equal Protection

The Plaintiff also raises an Equal Protection claim with regards to his cell assignments.  The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.  "This is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike.' "  <u>Artway v. Attorney General of State of N.J.</u>, 81 F.3d 1235, 1267 (3d Cir. 1996) (quoting <u>City of Cleburne, Tex. v. Cleburne Living Center</u>, 473 U.S. 432, 439 (1985)).

In the case at bar, Plaintiff does not allege that inmates who received their requested cell assignments were otherwise "similarly situated" to him. Thus, he has failed to allege a plausible equal protection claim.

## III.                CONCLUSION

For the reasons set forth above, it is respectfully recommended that the Motion to Dismiss (doc. no. 17) be granted as to Defendants Beard, the Pennsylvania Board of Probation and Parole Secretary and Acting Secretary, Wilson, the Attorney General of the Commonwealth of Pennsylvania and denied as to Defendant Sobina as to Plaintiff's retaliation claims regarding abusive cell searches and his transfer from SCI-Forest to SCI-Cresson in May of 2006. In addition, it is respectfully recommended that, in accordance with the PLRA, Plaintiff's claims be dismissed against all of the remaining Defendants except Defendants Barone, Hall and Wojcik as to the single claim that these Defendants either ordered or participated in abusive cell searches during January through April of 2006.

In accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of any appellate rights.

December 3, 2007

Lisa Pupo Lenihan
U.S. Magistrate Judge

cc:        The Honorable David S. Cercone
        United States District Judge

        Warren O'Connell, ES-9984
        SCI-Fayette
        50 Overlook Drive
        Labelle, PA 15450